DONALD J. CALLENDER and
CONVERGENCE MANAGEMENT
ASSOCIATES, LLC,

    Plaintiffs,

    v.

WADE CALLENDER and
ERICA CALLENDER,

    Defendants.

Civil Action No. TDC-17-3249

## MEMORANDUM OPINION

Plaintiffs Donald J. Callender and Convergence Management Associates, LLC ("CMA" or "Convergence") have filed this state law tort action against Defendants Wade Callender and Erica Callender arising from an intra-family dispute relating to a previously dismissed lawsuit in this Court. Presently pending before the Court is Wade Callender's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, Erica Callender's Motion to Dismiss, and Plaintiffs' Motion for Leave of the Court to File a Surreply. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Wade Callender's Motion is GRANTED IN PART and DENIED IN PART, Erica Callender's Motion is GRANTED, and Plaintiffs' Motion is DENIED.

## BACKGROUND

This case is the second action before this Court involving the Callender family. Donald Callender, divorced from Diane Callender, is the father of Defendant Wade Callender and the father-in-law of Erica Callender, Wade Callender's wife. Donald and Diane Callender have

another son, Christian Callender, who is not a party to this suit. In 2001, Donald Callender established CMA, a Maryland limited liability company ("LLC") of which he is the sole member, which provides financial services to various clients. In approximately 2007, Donald and Diane Callender retained an attorney, James P. Seidl, to develop an "asset protection" strategy for the family's assets. *Callender v. Callender*, No. C-14-1314 (Cir. Ct. Calvert Cty.) 11/3/16 Hearing Tr. ("Divorce Action Tr.") at 22-26, Wade Callender Mot. Dismiss Ex. 2, ECF No. 7-2.

This strategy began with the creation of at least three legal entities: Loch Sloidh Realty Trust, a Maryland grantor revocable trust; the Falkirk Family Limited Partnership ("Falkirk" or "the Partnership"), a Virginia family limited partnership; and the Pegasus Living Trust ("Pegasus"), a Maryland grantor revocable trust described by Seidl as a "standard living trust." Divorce Action Tr. at 25-27. Donald and Diane Callender were named as the trustees of Pegasus.

On April 13, 2007, the date that Falkirk was established, Donald Callender executed an "Assignment of Interest" ("the Assignment"), notarized by Seidl, which stated in full:

> By this Instrument, the Assignor's interest in the Convergence Management Associates, LLC, a Maryland Limited Liability Company, federal tax ID number 01-0604814, whose principal place of business is currently Prince Frederick, Maryland, is hereby assigned to the General Partners of the Falkirk Family Limited Partnership, a Virginia Limited Partnership, signed on April 13, 2007, under the terms of the Partnership in effect at the time of the Assignor's death.
>
> Hereby assigned are all of the company's assets, including but not limited to its real, personal, tangible, intangible and mixed property, accounts receivable, bank accounts, good will and investments, now owned or later acquired by the Company.
>
> This assignment is for estate planning purposes only, is subject to, and is therefore null and void to the extent it violates, the Article of Organization, the Company's Operating Agreement, or other Business Agreements, is contrary to law,

2

> inadvertently terminates any tax election or results in unintended adverse tax or
> legal results under federal, state or local law.

Assignment at 1, Wade Callender Mot. Dismiss Ex. 4, ECF No. 7-2.

As of May 4, 2007, CMA had been named as the general partner of Falkirk but held only a 1.345% interest in Falkirk. Donald and Diane Callender, limited partners of Falkirk, held interests of 0.1345% and 1.48%, respectively. The bulk of the interest in Falkirk was held by Christian and Wade Callender, who each held a 48.516% interest as limited partners.

In 2014, Diane Callender filed for divorce from Donald Callender in the Circuit Court for Calvert County, Maryland ("the Divorce Action"). On December 31, 2015, as the Divorce Action was ongoing, Donald Callender filed suit in this Court against Erica Callender, alleging that she fraudulently withdrew money from another LLC owned by Donald Callender ("the 2015 Action"). *See* Compl., *Callender v. Callender*, No. TDC-15-4015 (D. Md. Dec. 31, 2015) (ECF No. 1).[1] Although the 2015 Action was originally brought by Donald Callender in his personal capacity, CMA and the allegedly victimized company, Convergex Caribbean, Ltd. ("Convergex"), were substituted in as plaintiffs after the Court ruled that Donald Callender lacked prudential standing to pursue the case.

On November 3, 2016, Judge E. Gregory Wells of the Circuit Court for Calvert County held a hearing in the Divorce Action to determine how to divide up the marital property between Donald and Diane Callender. At the hearing, Seidl was called as a witness to explain the relevant legal entities and interpret the various documents that governed the Callenders' property. When asked about the Assignment, Seidl provided the following testimony:

---

[1] The Court takes judicial notice of the filings in the 2015 Action. Fed. R. Evid. 201(b)(2); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (stating that a court may take judicial notice of matters of public record.)

A [Seidl]: Yeah, I'm not actually sure, but I think we actually did an assignment, yes, and that would be the normal course of things.

Q [Counsel]: So therefore Convergence is owned by Falkirk and [Donald] Callender at one time owned 100 percent of Convergence, correct?

A: That's right.

Q: Therefore, by transferring it in, he was still the general partner, but he no longer had an ownership interest in Convergence outside of whatever interest he had in Falkirk, correct?

A: I'm not sure if I would say it that way.

Q: Then you say it the way you want to.

A: Well, so the husband, I call DJ, DJ still owned Convergence Associates, and he would still be governed by that document, for example, we're still a Maryland document.

Q: Right.

A: So he assigned his ownership to Falkirk. Does that answer your question?

Q: Yes. He gave up his ownership interest in Falkirk – in Convergence and he assigned it to Falkirk, correct?

A: I'm stuck on the word gave up his interest.

Q: Assigned it?

A: I would say he would still own interest – he was still 100 percent owner of Convergence.

Q: Well, when you assign it then, what interest do you have after you assign 100 percent?

A: The purpose of that assignment was so that Convergence could be the general partner of Falkirk. Otherwise he didn't give up. He still would manage it. In other words, it's not like the partners in Falkirk would suddenly go into Convergence and say, Ah ha, we now get to control you. In other words, it wasn't working that way.

Q: Well, then what does the assignment do?

4

A: Well, it just simply allows us to name Convergence as the general partner of the partnership, and I'm even thinking now we might not have done that. We might have assigned that to the living trust.

Q. Do you have a document with you want to look at?

A. I sure don't because for the very reason that you're bringing up, if we did a full assignment to the partnership, then actually the partnership—it becomes an asset of the partnership.

Divorce Action Tr. at 40-42. Seidl later testified that "I'm beginning to think maybe we assigned Convergence to Pegasus, so, in other words, Falkirk can't control Convergence," but that Pegasus could control Convergence "for the purpose of the living trust." *Id.* at 44.

During the lunch break of that hearing, Diane, Wade, and Christian Callender held a meeting of the Partnership without Donald Callender or a representative from CMA. These three limited partners, who collectively controlled over 98 percent of Falkirk's interests, voted to remove Donald Callender as the general partner. At the time, however, CMA, not Donald Callender, was the general partner of Falkirk. The three limited partners also agreed that "General Partner duties, if any, shall be exercised by 2/3 vote of the signatories hereto," except that sole decision-making authority regarding existing litigation was granted to Wade Callender. 11/3/16 Meeting Mins., Wade Callender Mot. Dismiss Ex. 7, ECF No. 7-2. Upon returning to Court, Wade and Christian Callender both recounted the vote in open Court, with no apparent objection from Donald Callender.

Two days later, on November 5, 2016, Wade Callender, along with a locksmith and an information technology specialist, entered the offices of CMA located at 1020 Prince Frederick Boulevard in Prince Frederick, Maryland. In a call to the Calvert County Sheriff's Department, Wade Callender stated that Judge Wells had granted control of the CMA office to him and that he intended to perform an audit of the company. Wade Callender removed various computers,

5

hard drives, and paperwork, including the litigation file relating to the 2015 Action. Wade Callender then removed thousands of dollars from CMA's bank accounts. On November 9, 2016, Wade Callender informed John Carpenter, the attorney who had been retained by Donald Callender to represent CMA in the 2015 Action, that his services were no longer required because Falkirk no longer wished for CMA to continue the action.

Diane, Wade, and Christian Callender conducted two more meetings of Falkirk without Donald Callender. In December 2016, they "unanimously reaffirmed their intent to remove any and all authority & control that Donald J. ('D.J.') Callender and Convergence Management Associates ever possessed over anything pertaining to the Partnership and any related trusts, assets, etc." Dec. 2016 Meeting Mins. at 1, Wade Callender Mot. Dismiss Ex. 8, ECF No. 7-2. They further stated that Donald Callender and CMA were not to have any control over Falkirk matters, as general partner or otherwise, on the grounds of:

> double-dealing, poor business practices, failure to abide his legal obligations to others (for which Donald J. Callender / his counsel have invoked the Fifth Amendment), the attempted use of aliases, the distortion of known facts, the illegitimate pursuit of litigation and attacks upon others (e.g. Erica Callender, Danielle Callender, and his fellow partners), the intentional dissipation of assets, salacious conduct with a co-worker and wife of a parishioner within Donald J. Callender's church, and willful deceit regarding the same.

*Id.* at 2.

On February 8, 2017, Attorney Brian T. Gallagher entered an appearance in the 2015 Action on behalf of the plaintiffs in that case, CMA and Convergex. After he filed a Stipulation of Dismissal with Prejudice, this Court ordered the case dismissed on February 21, 2017. The dismissal was not appealed by any party.

On November 3, 2017, Donald Callender and CMA filed the present Complaint in this Court against Wade and Erica Callender, alleging claims of conversion (Count I), trespass

6

(Count II), intentional infliction of emotional distress (Count III), tortious interference with business relationships (Count IV), and abuse of process (Count V) arising from Wade Callender's entry into the CMA offices and removal of CMA assets, and the decision to dismiss voluntarily the 2015 Action. On January 12, 2018, Diane, Christian, and Wade Callender held another meeting of the partners of Falkirk, again without Donald Callender or CMA. At that meeting, the attendees agreed that Falkirk had not authorized the present case, selected Diane Callender as the general partner of Falkirk, assigned decision-making authority over the litigation to Wade Callender, and changed Falkirk's situs from Virginia to Maryland.

## DISCUSSION

Wade Callender argues that the Complaint should be dismissed based on several threshold arguments, including judicial estoppel, *res judicata*, collateral estoppel, and Donald Callender's lack of standing to prosecute claims on behalf of CMA. Wade Callender also argues that the Complaint should be dismissed, or, alternatively, summary judgment entered in his favor, as to counts I, II, IV, and V on the grounds that Donald Callender and CMA lack authority to bring a lawsuit on behalf of CMA because Falkirk controls CMA, and Falkirk has not authorized this lawsuit. Wade Callender further asserts that Count III, the claim for intentional infliction of emotional distress, should be dismissed because his alleged actions, even if accepted as true, were not egregious enough to support such a claim under Maryland law. In her Motion to Dismiss, Erica Callender argues that Count V, the claim for abuse of process, should be dismissed as to her because Plaintiffs have not alleged that she played a role in the dismissal of the 2015 Action.

## I.    Motion for Leave to File a Surreply

Plaintiffs seek leave to file a surreply brief to respond to the argument made by Defendants in their Joint Reply to Plaintiffs' Opposition to the Motions to Dismiss that this action represents an improper appeal of the 2015 Action. This Court's Local Rules provide that surreply memoranda are not permitted unless otherwise ordered by the Court. D. Md. Local R. 105.2(a). Surreply briefs are generally disfavored in this District, *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 679 (D. Md. 2013), but they may be permitted "when the moving party would be unable to contest matters presented to the Court for the first time in the opposing party's reply," *TECH USA, Inc. v. Evans*, 592 F. Supp. 2d 852, 861 (D. Md. 2009).

A review of Defendants' reply memorandum shows that the argument that this case is an improper appeal of the 2015 Action is merely a refashioning of the argument that this action is barred by *res judicata*, an argument made at length in Wade Callender's Motion to Dismiss. Thus, Plaintiffs were on notice of this claim and had the opportunity to address it in their memorandum in opposition to Wade Callender's Motion to Dismiss. Moreover, as discussed below, *res judicata* is not a valid basis for dismissal, so additional briefing on this topic is neither helpful nor warranted. Accordingly, Plaintiffs' Motion will be denied.

## II.    Erica Callender's Motion to Dismiss

Erica Callender has filed a Motion to Dismiss the only count alleged against her, the abuse of process claim in Count V, on the grounds that Plaintiffs have failed to state a plausible claim for relief. To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

In the abuse of process claim, Plaintiffs assert that Wade Callender and Erica Callender improperly dismissed the 2015 Action on behalf of the plaintiffs in that case, CMA and Convergex. An abuse of process claim requires a plaintiff to show that (1) "the defendant willfully used process after it has issued in a manner not contemplated by law"; (2) "the defendant acted to satisfy an ulterior motive"; and (3) "damages resulted from the defendant's perverted use of process." *One Thousand Fleet L.P. v. Guerriero*, 694 A.2d 952, 956 (Md. 1997). "In order to establish an abuse of process, there must be a definite act or threat that is not authorized by the process or aimed at an objective not legitimate in the use of the process." *Attorney Grievance Comm'n of Md. v. Roberts*, 904 A.2d 557, 571 (Md. 2006). The archetypal abuse of process claim arises from the use of criminal process to coerce an individual to pay a debt in order to avoid arrest and prosecution. *See Palmer Ford, Inc. v. Wood*, 471 A.2d 297, 311 (Md. 1984) (collecting cases).

Here, Erica Callender asserts that the Complaint fails to state a plausible claim against her because it has not and cannot allege that she is a partner in Falkirk or participated in Falkirk's decision to withdraw from the 2015 Action. Erica Callender is correct that the predicate action leading to the dismissal of the 2015 Action, the vote by the limited partners of Falkirk to oust CMA and Donald Callender and to grant Wade Callender authority over ongoing litigation, was undertaken by others, that she is not a partner of Falkirk, and that there are no factual allegations

supporting the conclusion that she participated in that decision in any way. Although Plaintiffs allege that Bruce Marcus, an attorney who represented both Falkirk and Erica Callender, requested in November 2016 that Carpenter stop pursuing the 2015 Action and withdraw as counsel for CMA and Convergex, merely claiming that an opposing party lacks authority to pursue a claim cannot be construed as a use, much less abuse, of process. Plaintiffs have not identified, nor has the Court found, any example of a general demand for an attorney to drop a previously filed case or to withdraw from a case to be a "definite act" that can establish an abuse of process claim. *See Roberts*, 904 A.2d at 571. As Plaintiffs acknowledge in the Complaint, Marcus had no role in the actual dismissal of the case.

In contrast, Gallagher, the attorney who entered an appearance in the 2015 Action in February 2017 on behalf of CMA and Convergex and filed the February 8, 2017 Stipulation of Dismissal, was acting at the direction of Falkirk and did not represent Erica Callender, who was separately represented. The fact that a civil defendant such as Erica Callender assented to a stipulation of dismissal filed by counsel for the plaintiffs cannot be fairly characterized as an abuse of process by that defendant. Other than ungrounded speculation, Plaintiffs have provided no factual basis to support the conclusion that Erica Callender assisted Falkirk in pursuing this action. The Court will therefore grant Erica Callender's Motion to Dismiss as to Count V and dismiss her as a Defendant in this case.

## III. Wade Callender's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment

### A. Legal Standard

Wade Callender has filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, to which he has attached 14 exhibits. Typically, when deciding a motion to dismiss under Rule 12(b)(6), the Court considers only the complaint and any attached documents

10

"integral to the complaint." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some indication that the court is treating the 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (citation omitted). Although the notice requirement is not onerous, requiring only that the nonmoving party be aware that material outside the pleadings is pending before the court, *id.*, the reasonable opportunity requirement is more demanding. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002); *Hamilton v. Mayor & City Council of Balt.*, 807 F. Supp. 2d 331, 341 (D. Md. 2011).

Here, the notice requirement has been satisfied because the title of Wade Callender's Motion informed Plaintiffs of the possibility that the Motion could result in summary judgment. Howver, the Court finds that Plaintiffs have not shown that they require discovery before the Motion can be resolved. Although Plaintiffs state that "no discovery has been taken in this matter" and that "the motion for summary judgment filed by defendant Wade Callender is premature and thus should be denied on that basis alone," Opp'n Mot. Dismiss at 12, ECF No.

16, they have not provided the Court with a Rule 56(d) affidavit explaining why they cannot present facts essential to their opposition. Moreover, Plaintiffs have attached eight exhibits to their memorandum in opposition to the Motion, extrinsic materials that are only appropriately considered on a Motion for Summary Judgment. Therefore, the Court will consider Wade Callender's Motion as a Motion for Summary Judgment.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

## B.    Judicial Estoppel

Wade Callender first argues that the doctrine of judicial estoppel bars Plaintiffs from claiming ownership and control of CMA after allegedly making the opposite claim in the Divorce Action. Judicial estoppel is an "equitable doctrine that exists to prevent litigants from playing 'fast and loose' with the courts—to deter improper manipulation of the judiciary." *Folio v. City of Clarksburg, W. Va.*, 134 F.3d 1211, 1217 (4th Cir. 1998). "As an equitable doctrine, judicial estoppel is invoked in the discretion of the district court and with the recognition that

12

each application must be decided on its own specific facts and circumstances." *King v. Herbert J. Thomas Mem'l Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998).

The United States Court of Appeals for the Fourth Circuit has adopted a four-part test to determine when judicial estoppel should apply: (1) the party to be estopped must be advancing an assertion that is inconsistent with a position taken during previous litigation; (2) the position must be one of fact, rather than of law or legal theory; (3) the prior position must have been accepted by the court in the first proceeding; and (4) the party to be estopped must have acted intentionally, not inadvertently. *Havird Oil Co. v. Marathon Oil Co.*, 149 F.3d 283, 292 (4th Cir. 1998). While each factor must be satisfied in order to support application of judicial estoppel, the "determinative factor" is whether the party sought to be estopped "intentionally misled the court to gain unfair advantage." *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996). "Without bad faith, there can be no judicial estoppel." *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007).

Judicial estoppel does not apply here. Although Wade Callender alleges that Donald Callender claimed during the Divorce Action that he did not own and control CMA, that statement is not in the transcript of the November 3, 2016 hearing, nor have Defendants provided any other materials, such as briefs or other transcripts from the Divorce Action, to support their claim. At most, Donald Callender claimed in the Divorce Action that he did not own "the [marital] home and various things" because they were owned by a realty trust, but such a statement is not an assertion that he lacked ownership and control of CMA. Divorce Action Tr. at 4. Even if Donald Callender had claimed during the Divorce Action that he did not own or control CMA, there is no indication that the court relied on such a factual contention in any of its rulings. In the only Divorce Action court order included in the record, dated March 24, 2017

13

("the Alimony Order"), Judge Wells denied Donald Callender's Motion to Terminate Alimony, and held him in contempt for failing to pay alimony, based on an analysis of Donald Callender's income prior to the November 3, 2016 vote that treated CMA's income as belonging to Donald Callender. The court specifically declined to rule on the legality of the Partnership's vote to oust Donald Callender and CMA. Since there is no evidence that Donald Callender's present claim to control CMA is inconsistent with a prior factual position accepted by the circuit court, judicial estoppel is not grounds for dismissal of the Complaint.

### C. *Res Judicata*

Wade Callender next argues that the Complaint should be dismissed under the doctrine of *res judicata* because the factual basis for each of Plaintiffs' claims—the November 2016 entry into the CMA office and the February 2017 dismissal of the 2015 Action—occurred before the 2015 Action was dismissed. According to Wade Callender, the claims are now barred because they could have been brought by CMA as part of the 2015 Action or raised during an appeal of the dismissal of that case.

*Res judicata* is a legal doctrine that promotes judicial efficiency and the finality of decisions. *In re Microsoft Corp. Antitrust Litigation*, 335 F.3d 322, 325 (4th Cir. 2004). Under the doctrine of *res judicata*, a final judgment on the merits in an earlier decision precludes the parties from relitigating claims that were raised or could have been raised during that action. *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004). This doctrine applies when there is: (1) a final judgment on the merits in a prior lawsuit; (2) an identity of the cause of action in both the earlier and later suits; and (3) an identity of the parties or their privies in the two suits. *Id.* at 354–55. Cases involve the same "cause of action" if they "arise out of the same transaction

or series of transactions or the same core of operative facts." *Pueschel*, 369 F.3d at 355 (quoting *In re Varat Enters., Inc.*, 81 F.3d 1310, 1316 (4th Cir. 1996)).

The 2015 Action was dismissed with prejudice when, following the Partnership vote, Wade Callender retained new counsel for CMA who requested that the Court dismiss that action with prejudice. Although dismissal with prejudice is a final judgment on the merits for the purposes of *res judicata*, the Court finds that there is no identity of cause of action between the 2015 Action and the present case. In the 2015 Action, the claim was that Erica Callender had misappropriated funds from a Convergex bank account at the Bank of the Bahamas in 2010 and 2012. *See* 2015 Action Am. Compl. ¶¶ 8-28 (ECF No. 42). No claims were asserted relating to either Wade Callender's alleged trespass into CMA or the ownership of CMA, and those claims cannot fairly be construed to "arise out of the same transaction or series of transactions or the same core of operative facts" as the claims relating to the Convergex bank account. *See Pueschel*, 369 F.3d at 355. In fact, although the plaintiffs in the 2015 Action, CMA and Convergex, sought to clarify the ownership of CMA by filing a "Motion Seeking an Order from the Court Compelling Defendant to Establish that her Husband, Through a Family Limited Partnership, Controls [CMA], as Represented by her Counsel" ("Motion for an Ownership Order"), Mot. Ownership Order, TDC-15-4015 (ECF No. 54), the Court specifically declined to consider the issue based on a lack of subject matter jurisdiction, concluding that the "dispute over ownership of CMA . . . is a separate issue, based on different facts, which can be resolved without reference to the contentions stated in the Amended Complaint." Order at 3, TDC-15-4015 (ECF No. 67). Because the claims in the present case do not arise from the same transactions at issue in the 2015 Action, *res judicata* does not apply.

### D.    Collateral Estoppel

Relatedly, Wade Callender also argues that the Complaint should be dismissed based on the doctrine of collateral estoppel. Under collateral estoppel, issues of fact or law that have been conclusively determined in a previous lawsuit cannot be litigated in subsequent lawsuits brought by the same party. *In re Microsoft Corp.*, 355 F.3d at 326. Collateral estoppel applies if (1) the issue "is identical to the one previously litigated"; (2) the issue "was actually resolved in the prior proceeding"; (3) the issue "was critical and necessary to the judgment in the prior proceeding"; (4) the prior judgment is final and valid; and (5) the party "to be foreclosed by the prior resolution of the issue" had "a full and fair opportunity to litigate the issue" in the prior proceeding. *Id.*

According to Wade Callender, the denial of the Motion for an Ownership Order and the subsequent dismissal of the 2015 Action constituted a decision on the merits on all of the issues of fact and law in the present case. Wade Callender further argues that the Alimony Order establishes that these issues were resolved by that Court as well. As discussed above, however, in the 2015 Action, this Court specifically declined to decide the validity of Falkirk's actions and the ownership of CMA. Likewise, the Alimony Order specifically states that the court "declines to rule on the legality of the sons' actions in ousting their father" during the November 3, 2016 Partnership vote. Alimony Order at 2 n.1, Wade Callender Mot. Dismiss Ex. 14, ECF No. 7-2. Where the ownership of CMA was not "actually resolved" in one of the prior proceedings, collateral estoppel does not apply. *See In re Microsoft Corp.*, 355 F.3d at 326.

### E.    Standing

Wade Callender also argues that Donald Callender lacks standing to bring this case because CMA is the entity allegedly harmed by Defendants' actions, CMA is now owned by

Falkirk, which Donald Callender no longer controls, and in any event an individual member of an LLC does not have standing to bring lawsuits for damages suffered by the company. Setting aside the ownership argument, the Court agrees that Donald Callender lacks standing to pursue a claim for injuries suffered by CMA only. This same issue presented itself in the 2015 Action, which was originally brought by Donald Callender against Erica Callender for allegedly misappropriating funds from Convergex, a corporation of which Donald Callender was the only shareholder. *See Callender v. Callender*, No. TDC-15-4015, 2016 WL 3647613, at *1-3 (D. Md. June 30, 2016). The Court granted a motion to dismiss as to Donald Callender because the funds at issue in the case belonged to Convergex, the conversion injured only Convergex, and Donald Callender's status as a shareholder did not give him prudential standing to assert claims on its behalf. *Id.* at *3; *see Franchise Tax Bd. Of Cal. V. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990) (holding that a shareholder lacks prudential standing to assert a claim for injuries to a corporation). Likewise, a member of an LLC such as CMA lacks standing to assert the LLC's claims. *See Gen. Technology Applications, Inc. v Exro Ltda*, 388 F.3d 114, 119 (4th Cir. 2004). Accordingly, because the plaintiffs in the 2015 Action at the time it was dismissed were CMA and Convergex, Donald Callender lacks standing to pursue the abuse of process claim in Count V for the allegedly fraudulent dismissal of that case.

As for the conversion claim in Count I, Plaintiffs mainly assert an injury to CMA, not Donald Callender. In his affidavit, Donald Callender states that when Wade Callender entered "the offices leased by me" that were "used by CMA," he "made off with computers, hard drives, files, including the litigation file of the prior matter, tax records, and check books, as well as personal property belonging to both myself and an associate." Donald Callender Aff. ¶ 13, Opp'n Mot. Dismiss Ex. 1, ECF No. 16-2. He further asserts that Wade Callender "went to the

Suntrust Bank in Prince Frederick, Maryland and took control of Company bank accounts, removing thousands of dollars of account receivables." *Id.* With the exception of the unspecified personal property belonging to Donald Callender, all of the allegedly converted property belonged to CMA. In particular, the litigation file belonged to the plaintiffs in the 2015 Action, CMA and Convergex, not Donald Callender. Nevertheless, although Donald Callender lacks standing to assert a claim for conversion relating to the computers, hard drives, files, tax records, and check books from the CMA office and the bank accounts held by CMA, because he alleges that some of the personal property taken from the CMA office belonged to him, the Court finds that Donald Callender has standing to assert a conversion claim.

Likewise, because Donald Callender states in his affidavit that he personally leased the office space that Wade Callender entered, he has standing to assert the trespass claim in Count II. Donald Callender's claim that Wade Callender's entry was emotionally "devastating" provides standing for his personal assertion of the claim of intentional infliction of emotional distress in Count III. *Id.* Finally, although it is unclear whether the tortious interference with business relationships claim in Count IV refers to the relationship between Donald Callender and CMA, or the relationship between CMA and its clients, the Court will construe Count IV as a claim for tortious interference with Donald Callender's relationship with CMA and find that Donald Callender has standing to bring such a claim in his personal capacity. Accordingly, the Court will grant Wade Callender's Motion as to Donald Callender's abuse of process claim in Count V and decline to dismiss the remaining counts for lack of standing

### F.     Intentional Infliction of Emotional Distress

Although Wade Callender's threshold arguments for blanket dismissal fail, he correctly asserts that the claim in Count III for intentional infliction of emotional distress cannot succeed.

18

In that count, Plaintiffs claim that Wade Callender's conduct, including entry into CMA's offices and removal of CMA's property, was "intentional, reckless, extreme, and outrageous" and thereby caused Donald Callender "severe emotional distress for which he seeks recovery." Compl. ¶ 40, ECF No. 1. To state a claim for intentional infliction of emotional distress ("IIED") under Maryland law, a plaintiff must show (1) intentional or reckless conduct; (2) that was extreme and outrageous; (3) the plaintiff suffered severe emotional distress; and (4) there was a causal connection between the conduct and the emotional distress. *Harris v. Jones*, 380 A.2d 611, 614 (1977).

The Complaint does not allege sufficient facts to meet the second element. A defendant is liable for IIED only if the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 614 (quoting Restatement (Second) of Torts § 46 cmt. d (American Law Inst. 1965)); *see, e.g.*, *B.N. v. K.K.*, 538 A.2d 1175, 1181 (Md. 1988) (stating that "[o]ne who knowingly engages in conduct that is highly likely to infect another with an incurable disease of this nature, and who also is aware of the nature of the disease" has engaged in conduct meeting the standard for IIED); *Reagan v. Rider*, 521 A.2d 1246, 1251 (Md. Ct. Spec. App. 1987) (affirming a jury verdict of IIED against the plaintiff's stepfather who had engaged in sexual abuse of the plaintiff during six years of her childhood). Wade Callender's alleged actions of leading a Partnership vote to remove Donald Callender and CMA from controlling roles in Falkirk, entering the offices of a business in which he had, at a minimum, an indirect financial interest, and removing items falls substantially short of atrocious, extreme, or intolerable activity. *See, e.g., Beye v. Bureau of Nat'l Affairs*, 477 A.2d 1197, 1204–05 (Md. Ct. Spec. App. 1984) (holding that allegations that the plaintiff's supervisors gave him poor

performance ratings, threatened to fire him, harassed him, physically assaulted him, passed him over for promotion, and deceived him into resigning were not sufficient to state an IIED claim). Moreover, Donald Callender has alleged no facts that would support the conclusion that his emotional distress was "so severe that no reasonable [person] could be expected to ensure it." *Harris*, 380 A.2d at 616. Accordingly, the Court will grant Wade Callender's Motion as to Count III and dismiss the IIED claim.

### G. Remaining Claims

As for the remaining claims, Wade Callender argues that he is entitled to summary judgment on all claims because Falkirk owns and controls CMA as a result of the November 3, 2016 vote, so he was authorized to enter CMA's office, to remove any items belonging to CMA, and to dismiss the 2015 Action. Based on these assertions, Wade Callender argues that because Falkirk controls CMA, Plaintiffs lack authority to assert these claims against the will of Falkirk, and that, in any event, Wade Callender's actions were authorized and therefore did not constitute conversion, trespass, tortious interference with business relationships, or abuse of process.

Under Wade Callender's theory, Donald Callender "assigned CMA's ownership to" Falkirk through the Assignment, effectively transferring all control of CMA from Donald Callender to Falkirk, and the November 3 vote resulted in "new management" at Falkirk that transferred authority to control Falkirk's assets from Donald Callender to Wade, Christian, and Diane Callender collectively. Wade Callender Mot. Dismiss at 2. Wade Callender's actions, including facilitating the dismissal of the 2015 Action, entering CMA's offices, and removing various items from those offices, are merely the authorized actions of the chosen agent of CMA's governing body. Furthermore, Wade Callender emphasizes that the vote to strip Donald

Callender of control over Falkirk was announced in an open court, without objection from Donald Callender.

Donald Callender maintains that the Assignment transferred neither ownership nor control of CMA to Falkirk, such that the November 3 vote had no effect on CMA's prosecution of the 2015 Action and did not provide authorization for Wade Callender's entry into CMA's offices. In support of his position, Donald Callender claims that he lost no rights to CMA through the Assignment, because the language stating that the Assignment was made "under the terms of the Partnership in effect at the time of the Assignor's death" should be interpreted to mean that the Assignment was intended to become operative only at the time of his death, and because, by its own terms, the Assignment is "null and void to the extent it violates [CMA's] Articles of Organization, the Company's Operating Agreement, or other Business Agreements." Assignment at 1.

Therefore, both parties claim to derive their ownership and control of CMA from the Assignment, which the Court construes as a contract between the Assignor, Donald Callender, and the Assignee, the General Partners of Falkirk. Because Donald Callender's claims assert state law causes of action, this Court applies the choice-of-law principles of the forum state, Maryland, including Maryland's choice-of-law rules for contract interpretation. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Branhaven, LLC v. BeefTek, Inc.*, 965 F. Supp. 2d 650, 664 (D. Md. 2013) ("When a claim is based on state law, the choice of law rules are those of the state in which the district court sits."). If a contract contains a choice-of-law provision, Maryland courts will apply the law of the state identified in that provision. *See Kunda v. C.R. Bard, Inc.*, 671 F.3d 464, 469 (4th Cir. 2011). However, if a contract does not contain a choice-of-law provision, Maryland courts follow the principle of *lex loci contractus*, under which

the applicable law is that of the jurisdiction where the contract was formed. *See, e.g., Allstate Ins. Co. v. Hart,* 611 A.2d. 100, 101 (Md. 1992). Here, the Assignment contains no choice-of-law provision but was executed in Virginia, so the Court applies Virginia law.

Under Virginia law, "[c]ontracts are construed as written, without adding terms that were not included by the parties." *TM Delmarva Power, LLC v. NCP of Virginia, LLC,* 557 S.E.2d 199, 200 (Va. 2002). A contract is construed according to its plain meaning, so long as its terms are clear and unambiguous. *Id.* Contracts "must be considered as a whole without giving emphasis to isolated terms," and each word or clause of the contract will be given meaning so long as a reasonable meaning can be given to it. *Id.* "When two provisions of a contract seemingly conflict," Virginia courts will interpret the contract in a way that retains each provision "without doing violence to any of its language" and in a way that "effectuate[s] the intention of the parties as expressed in the contract considered as a whole." *Ames v. Am. Nat. Bank of Portsmouth,* 176 S.E. 204, 217 (Va. 1934); *see also Plunkett v. Plunkett,* 624 S.E.2d 39, 42 (Va. 2006).

The question whether a contract is ambiguous is a matter of law, not of fact, to be determined by a court before the question is submitted to a fact finder. *Video Zone, Inc. v. KF & F Props., LC,* 594 S.E.2d 921, 923 (Va. 2004). A contract is not considered ambiguous merely because the parties disagree as to the meaning of a term. *TM Delmarva,* 557 S.E.2d at 200. Rather, "[t]he language of a contract is ambiguous if 'it may be understood in more than one way or when it refers to two or more things at the same time.'" *Video Zone,* 594 S.E.2d at 923 (quoting *Eure v. Norfolk Shipbuilding & Drydock Corp.,* 561 S.E.2d 663, 668 (Va. 2002)). If a contract is ambiguous, Virginia courts will consider parol evidence—evidence outside of the

22

contract itself—"not to contradict or vary contract terms, but to establish the real contract between the parties." *Video Zone*, 594 S.E.2d at 924.

After reviewing the submitted materials, the Court finds that the record is insufficient to grant summary judgment in favor of Wade Callender based on his contention that Falkirk controlled CMA following the November 3 vote. Although the Assignment states that it is "null and void to the extent it violates, [CMA's] Articles of Organization, [CMA's] Operating Agreement, or other Business Agreements," not all of these documents, which can be considered intrinsic to the contract, have been provided in the record. Without reviewing these documents explicitly referenced in the Assignment, the Court cannot fairly assess the meaning and validity of the Assignment.

The testimony of Seidl in the Divorce Action, rather than shedding light on how to interpret the Assignment, merely raises additional questions. At one point, Seidl testified that "if we did a full assignment to the [P]artnership, then actually the [P]artnership—it becomes an asset of the [P]artnership." Divorce Action Tr. at 42. At another point, however, when questioned on the meaning of the Assignment, Seidl stated that "maybe we assigned [CMA] to Pegasus," the Callender's living trust, "so, in other words, Falkirk can't control [CMA]." *Id.* at 44, Based on the assumption that CMA had been assigned to Pegasus, he stated that "the trustees [of Pegasus] can't move in on [CMA] or Falkirk for that matter, and say, Ah ha, you've been assigned to us therefore we get to control you." *Id.* To the extent that whether CMA was separately assigned to Pegasus could affect whether Falkirk controls CMA, the record lacks evidence, such as documentation of any such assignment and the governing documents of Pegasus, that would allow the Court to determine whether such an assignment took place and what impact, if any, it would have on the issues in this case. Thus, the Court presently lacks

necessary materials to interpret the Assignment and determine whether summary judgment is warranted.

Under these circumstances, the Court will deny without prejudice Wade Callender's Motion for Summary Judgment as to the question of the control of CMA, subject to renewal after discovery has been completed. This approach will allow the parties to collect and provide to the Court all documents and other evidence, including extrinsic evidence that may be relevant should the Assignment be deemed ambiguous, that is necessary to allow the Court to interpret the terms of the Assignment. Wade Callender shall therefore be ordered to file an Answer, after which the Court shall enter a Scheduling Order to begin discovery.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Leave to File a Surreply is DENIED; Erica Callender's Motion to Dismiss is GRANTED; and Wade Callender's Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment, construed as a Motion for Summary Judgment, is GRANTED IN PART and DENIED IN PART. Wade Callender's Motion is granted in that Count III and Donald Callender's claim in Count V are dismissed. The Motion is denied in all other respects. A separate Order shall issue.

Date: July 26, 2018

THEODORE D. CHUANG
United States District Judge