UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

DONALD J. CALLENDER and
CONVERGENCE MANAGEMENT
ASSOCIATES, LLC,

    Plaintiffs,

v.

WADE CALLENDER,

    Defendant.

Civil Action No. TDC-17-3249

## MEMORANDUM OPINION

Plaintiffs Donald Callender and Convergence Management Associates, LLC ("CMA") have filed this tort action against Defendant Wade Callender, who has in turn filed several counterclaims against both Plaintiffs. Pending before the Court is Wade Callender's Motion for Summary Judgment. Having reviewed the briefs and submitted materials, the Court finds that no hearing is necessary. D. Md. Local R. 105.6. For the reasons set forth below, Wade Callender's Motion is GRANTED.

## BACKGROUND

Relevant background is set forth in this Court's two previous opinions in this case. *See Callender v. Callender*, No. TDC-17-3249, 2019 WL 1980700, at *1 (D. Md. May 3, 2019) ("*Callender II*"); *Callender v. Callender*, No. TDC-17-3249, 2018 WL 3609536, at *1-4 (D. Md. July 26, 2018) ("*Callender I*"). The Court sets forth below the additional facts relevant to the resolution of the pending Motion.

## I. The Partnership and the Assignment

On April 13, 2007, the Falkirk Family Limited Partnership ("Falkirk") was formed under Virginia law. As initially constituted pursuant to the Limited Partnership Agreement of Falkirk (the "Partnership Agreement"), Falkirk had four limited partners—Donald Callender; his wife, Diane Callender; and their two sons, Christian and Wade Callender. Falkirk had one General Partner—Donald Callender, in his capacity as president of CMA. Among other purposes, Falkirk was formed to "provide consolidated management of the assets held by the partnership," "to assist in preventing family assets from going through probate upon the death of any family member," "to consolidate fractional interests in family-held assets," and "to promote family harmony by insuring that any disputes will be resolved privately by arbitration rather than publicly through the courts." Joint Record ("J.R.") 238-239, ECF No. 84. In his deposition, Donald Callender has testified that Falkirk was conceived of as a means of circumventing the estate tax, which he "consider[s] . . . to be egregious." J.R. 49. Specifically, he testified that by organizing Falkirk such that members of his family "would already be owners" of his assets at the time of his death, these assets would not be considered to be inherited, and so "you avoid . . . an egregious tax." *Id.*

The same day Falkirk was formed, Donald Callender executed a document styled as an "Assignment of Interest" ("the 2007 Assignment"). J.R. 313. The document states that Donald Callender's interest in CMA "is hereby assigned to the General Partners of the Falkirk Family Limited Partnership . . . under the terms of the Partnership in effect at the time of [Donald Callender's] death." *Id.* The 2007 Assignment further provides: "Hereby assigned are all of the company's assets, including but not limited to its real, personal, tangible, intangible and mixed property . . . now owned or later acquired by [CMA]." *Id.* Finally, the 2007 Assignment states that it "is for estate planning purposes only, is subject to, and is therefore null and void to the extent

2

it violates, the Articles of Organization, the Company's Operating Agreement, or other Business Agreements, is contrary to law, inadvertently terminates any tax election or results in unintended adverse tax or legal results under federal, state or local law." *Id.*

The 2007 Assignment was referenced in the minutes of Falkirk's Organizational Meeting on April 13, 2007 ("the Organizational Meeting Minutes"), signed by Donald, Diane, Christian, and Wade Callender, which stated that "Initial Schedule A of contributed property to the partnership was approved." J.R. 315. Initial Schedule A, described as a "Schedule of Contributed Property to the Partnership," lists "All Assets of Convergence Management Associates, LLC" as property that had been contributed to Falkirk. J.R. 322. Similarly, a Second Schedule A, approved on May 4, 2007, lists "All Interests of Convergence Management Associates, LLC" as property that had been contributed to Falkirk. J.R. 323.

## II. The Partnership Vote

In 2014, Diane Callender filed for divorce from Donald Callender in the Circuit Court for Calvert County, Maryland ("the Circuit Court"). *See Callender v. Callender*, No. 14-1314 (Cir. Ct. Calvert Cty. 2014); Fed. R. Evid. 201(b)(2) (permitting the court to take judicial notice of facts not subject to reasonable dispute). On December 31, 2015, while the divorce proceedings were ongoing, Donald Callender filed suit in this Court against Erica Callender, Wade Callender's wife, claiming that she fraudulently withdrew money from another company owned by Donald Callender. *See* Compl. ¶¶ 25-28, ECF No. 1, *Callender v. Callender*, No. TDC-15-4015 (D. Md. Dec. 31, 2015). After the Court ruled that Donald Callender lacked prudential standing in the matter, CMA and another allegedly victimized company owned by Donald Callender, Convergex Caribbean, Ltd. ("Convergex"), were substituted in as the plaintiffs.

3

On November 3, 2016, the Circuit Court held a hearing on the division of property between Donald and Diane Callender. At that hearing, the court heard from James Seidl, the attorney who drafted the Partnership Agreement, who testified, among other things, that partners with a combined interest of more than 85 percent could hold a meeting and vote to oust the General Partner. Subsequently, during the lunch break in the hearing, Diane, Christian, and Wade Callender convened a meeting of Falkirk at a nearby restaurant. During the meeting, all three individuals—who together controlled over 98 percent of Falkirk—voted to remove Donald Callender as the General Partner of Falkirk and approved written "Minutes of Meeting" which they each signed. J.R. 99. They further voted that any general partner duties would be exercised by a 2/3 vote of Diane, Christian, and Wade Callender, except that Wade Callender alone would have full control of ongoing litigation. During the hearing's afternoon session, this vote was reported to the court. On December 6, 2016, Diane, Christian, and Wade Callender held another meeting of Falkirk, at which they "unanimously reaffirmed their intent to remove any and all authority & control that Donald J. ('D.J.') Callender and Convergence Management Associates ever possessed over anything pertaining to the Partnership and any related trusts, assets, etc." J.R. 102. They also reiterated "their desire that neither Donald J. Callender nor Convergence Management Associates have any control over matters pertaining to the personal or property rights of others, as General Partner or otherwise." *Id.* Then, on February 8, 2017, Wade Callender had an attorney file a stipulation of dismissal with prejudice in the lawsuit against Erica Callender, thereby ending that lawsuit.

### III. The CMA Office

At the time of the vote to remove Donald Callender as General Partner of Falkirk, CMA maintained an office in Prince Frederick, Maryland ("the CMA Office"). The lease for the CMA

Office was signed by JLH Group, LLC as the landlord and CMA as the tenant. According to Donald Callender, Convergex, referenced in different parts of the lease as both a landlord and a tenant, was not the landlord.

On November 5, 2016, Wade Callender, along with Diane Callender, Christian Callender, and several others, went to this office. Although they lacked the means to enter the office, they brought along a locksmith. At the request of Wade Callender, a law enforcement officer from the Calvert County Sheriff's Department accompanied them into the office. Once inside, personnel from a data retrieval company they had retained removed a computer, hard drives, and various paper files. Although Wade Callender testified that only property controlled by Falkirk was seized, Donald Callender has asserted that a handful of seized items belonged to him personally.

**IV.    Procedural History**

On November 3, 2017, Donald Callender and CMA filed the present case, asserting claims of conversion and civil theft, trespass, intentional infliction of emotional distress, and tortious interference with business relations against Wade Callender, and a claim of abuse of process against both Wade Callender and Erica Callender. After Wade and Erica Callender filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, the Court issued a memorandum opinion on July 26, 2018 in which it dismissed Erica Callender as a defendant; dismissed Donald Callender's abuse of process claim; dismissed both Plaintiffs' intentional infliction of emotional distress claims; and denied Wade Callender summary judgment on the remaining claims. *Callender I*, 2018 WL 3609536, at *12.

On August 9, 2018, Wade Callender filed an Answer to Plaintiffs' remaining claims and asserted counterclaims of abuse of process and defamation against Donald Callender, and of breach of the partnership agreement and false light against both Donald Callender and CMA.

Plaintiffs moved to dismiss these counterclaims, and on May 3, 2019 the Court dismissed the abuse of process, defamation, and false light counterclaims, but declined to dismiss the breach of partnership agreement counterclaim. *Callender II*, 2019 WL 1980700, at *4. After the completion of discovery, this Motion followed.

## DISCUSSION

In his Motion, Wade Callender seeks summary judgment on the remaining claims brought by Plaintiffs, specifically, both Plaintiffs' conversion, trespass, and tortious interference with business relations claims, and CMA's abuse of process claim.

### I. Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

### II. Conversion and Civil Theft

Donald Callender claims that Wade Callender's seizure of various items from the CMA Office constituted conversion and civil theft. Because the alleged tort took place in Maryland, the

Court applies Maryland law. *Proctor v. Wash. Metro. Area Transit Auth.*, 990 A.2d 1048, 1068 (Md. 2010).

"Conversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind." *Yuan v. Johns Hopkins Univ.*, 157 A.3d 254, 269 (Md. 2017) (citation omitted). The physical element is met by "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Id.* (citation omitted). The element of intent is met by evidence showing that "the defendant possessed an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Id.* at 270 (citation omitted). This element can be met even when the defendant "acted in good faith and lacked any consciousness of wrongdoing." *Id.* (citation omitted).

The parties here do not contest the element of intent; instead, they disagree whether Wade Callender's seizure of the items from the CMA Office was inconsistent with either of the Plaintiffs' rights. The resolution of this disagreement turns on the effects of the 2007 Assignment and the November 3, 2016 partnership vote.

### A. The 2007 Assignment

The Court has previously determined that the 2007 Assignment is a contract governed by Virginia law. *Callender I*, 2018 WL 3609536, at *10 ("Here, the Assignment contains no choice-of-law provision but was executed in Virginia, so the Court applies Virginia law."); *see also TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) ("The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (citation omitted)). Virginia law provides that contracts are to be construed according to their plain meaning as long as their terms are clear and unambiguous. *See TM Delmarva Power, LLC v. NCP of Va., LLC*, 557 S.E.2d 199, 200 (Va. 2002). Whether a

contract is ambiguous is a question of law for a court to decide. *Video Zone, Inc. v. KF & F Props., LC*, 594 S.E.2d 921, 923 (Va. 2004). A contract is ambiguous if its language "may be understood in more than one way." *Id.* (citation omitted). If a court determines that a contract is ambiguous, it may consider parol evidence on the intent of the parties in order to "to establish the real contract between the parties." *Id.* at 924.

Consistent with the Court's previous analysis in denying Wade Callender's first Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, the 2007 Assignment is ambiguous as to the effective date of the transfer of CMA's assets to Falkirk. *Callender I*, 2018 WL 3609536, at *11-12. The 2007 Assignment is written in the present tense, stating that "the Assignor's interest in [CMA] . . . is hereby assigned to the General Partners of [Falkirk]." J.R. 313; *see also id.* ("Hereby assigned are all of the company's assets . . . now owned or later acquired by the Company."). This choice of tense reasonably reflects that the assignment was to take effect immediately. Yet the 2007 Assignment further states that the assignment was made "under the terms of the Partnership in effect at the time of the Assignor's death," and that the assignment "is for estate planning purposes only," language which arguably suggests that the transfer was to take effect only upon Donald Callender's death. J.R. 313. Where the language is susceptible to more than one interpretation, the 2007 Assignment is ambiguous and the Court may consider extrinsic evidence to resolve the ambiguity.

As discussed in the Court's memorandum opinion on the First Motion, the Court finds the testimony of attorney James Seidl, who drafted the 2007 Assignment itself ambiguous and inconclusive. *Callender I*, 2018 WL 3609536, at *11. However, two other forms of extrinsic evidence lead the Court to conclude that the 2007 Assignment was intended to be effective immediately. First, Falkirk's separate but contemporaneous Organizational Meeting Minutes, also

signed by Donald Callender, support this conclusion. "In the interpretation of ambiguous language in a contract, the construction put upon it by the contracting parties is entitled to great weight in the courts." *Fed. Ins. Co. v. Starr Elec. Co.*, 410 S.E.2d 684, 688 (Va. 1991). On the same day that the 2007 Assignment was executed, Donald Callender and his family members signed the Organizational Meeting Minutes, which stated that the partners had "approved" the "Initial Schedule A of contributed property to the partnership," which listed the "contributed property" as including "All Assets of Convergence Management Associates, LLC" contributed by CMA. J.R. 315, 322. Where both the Organizational Meeting Minutes and Initial Schedule A used the past tense in referring to the "contributed" property, and neither contained any language suggesting that the transfer would not occur until Donald Callender's death, these separate documents signed by Donald Callender the same day support the conclusion that the assignment was effective as of April 13, 2007.

This conclusion is qualified to a limited extent by a subsequent "Second Schedule A" signed on May 4, 2007 in which Donald Callender, as General Partner of Falkirk, listed property contributed to Falkirk as including "All Interests of Convergence Management Associates, LLC" and noted in the column identifying the partner making the contribution, "Retained by D.J. Callender: Convergence Management Associates, LLC." J.R. 323. This language is itself somewhat ambiguous, in that it arguably reflects that Donald Callender was not immediately transferring this property to Falkirk. However, it is also consistent with the fact that the 2007 Assignment purported to assign CMA's assets not to Falkirk as a whole, but rather only to the "General Partners" of Falkirk, J.R. 313, which at that time consisted of only Donald Callender in his capacity as President of CMA. Nevertheless, where the statements in the Organizational Meeting Minutes and Initial Schedule A are more indicative of Donald Callender's intent at the

time of the 2007 Assignment executed that same day, the Court finds that the language of these additional documents on balance supports the conclusion that the CMA assets were immediately transferred as of April 13, 2007.

Second and more importantly, the testimony of Donald Callender supports the conclusion that the 2007 Assignment was intended to be effective immediately. In his deposition, Donald Callender testified that he set up Falkirk as a means of evading the estate tax, such that his "principal reason" for establishing Falkirk was for it to become effective upon his death. J.R. 49. However, as for the ownership of his assets, he testified that if the potential inheritors are "already involved in the estate, if they're already members of a family limited partnership that owns the home, for instance, then it wouldn't be inherited. They would already be owners and you avoid the . . . egregious tax." J.R. 49. This testimony, which also explained the statement in the 2007 Assignment that it was for "estate planning purposes only," J.R. 313, definitively establishes Donald Callender's intent that his family members, through Falkirk, would own the property before his death, even while he expected that Falkirk would not actively take control of his property during his lifetime.

This conclusion is not altered by the August 9, 2019 affidavit submitted by Donald Callender, in which he asserts that he maintained ownership and control of CMA after 2007 and that Falkirk did not gain control of CMA through the 2007 Assignment. First, in the affidavit, Donald Callender notably does not refute or disavow his prior testimony that he intended to transfer ownership of his assets to Falkirk before his death to avoid estate taxes. Second, to the extent that the affidavit could be read as contradicting that prior deposition testimony, the Court will rely on the testimony rather than a contradictory, self-serving affidavit submitted in opposing a motion for summary judgment. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806

(1999) (stating that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition)"); *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975-76 (4th Cir. 1990) (disregarding an affidavit that contradicted the affiant's prior deposition testimony).

Finally, although Donald Callender asserts in his affidavit that Falkirk's "control and operation of CMA" violated the terms of CMA's operating agreement, J.R. 326, and thus rendered the 2007 Assignment "null and void," J.R. 313, Plaintiffs have not explained how specifically the transfer of CMA's assets and interests to Falkirk would violate the terms of the operating agreement. Although Plaintiffs claim that the CMA operating agreement was taken by Wade Callender when he entered CMA's office and that Wade Callender has not produced it in response to a discovery request, it is not clear whether they sought that document in their Motion to Compel. In that motion, Plaintiffs sought an order requiring the production of "[a]ll documents, files, computers and hard drives . . . removed from the offices of [CMA] on or about November 05, 2016," but they also expressly stated that they were not seeking the Court's intervention with respect to their request for CMA's operating agreement. Mot. Compel at 19-20, 21, ECF No. 45. In any event, after the Motion to Compel was granted and Wade Callender produced documents to Plaintiffs, they did not claim that the CMA operating agreement had not been produced; rather they filed only a Motion for Sanctions in which they sought attorney's fees arising from the need to file a Motion to Compel. *See* Mar. 27, 2019 Letter Order at 3, ECF No. 50 (granting the Motion to Compel as to document requests); May 8, 2019 Notice of Intent to File a Motion at 3, ECF No. 57-1 (acknowledging that document productions were made); Mot. Sanctions at 4, 9, ECF No. 65. Where the nonmoving party ultimately "had a full opportunity to conduct discovery," it must

present "affirmative evidence in order to defeat a properly supported motion for summary judgment . . . even where the evidence is likely to be within the possession of the [moving party]." *Anderson*, 477 U.S. at 257. Upon consideration of the available extrinsic evidence in the record, the Court finds that the 2007 Assignment transferred ownership of CMA's assets to the General Partner of Falkirk at the time of the 2007 Assignment.

### B. The Partnership Vote

Resolution of the question whether the 2007 Assignment transferred CMA's assets to the General Partner of Falkirk does not by itself resolve the question whether Wade Callender's seizure of the items from the CMA Office was inconsistent with the rights of either Plaintiff. This question requires the resolution of another dispute between the parties: whether Donald Callender and CMA were properly removed as General Partner of Falkirk during the November 3, 2016 meeting of Diane, Christian, and Wade Callender.

The evidence establishes that at the time of that meeting, Donald Callender, in his capacity as President of CMA, was the only General Partner of Falkirk. During that meeting, Diane, Christian, and Wade Callender voted to remove Donald Callender as General Partner. Plaintiffs argue that where the minutes do not explicitly state that Donald Callender was removed in his capacity as President of CMA, the vote mistakenly removed Donald Callender in his personal capacity, who was only a limited partner at the time, and was therefore ineffective. Considered as a whole, however, the minutes of the November 3, 2016 meeting are most fairly read to establish that the voting partners were, in fact, seeking to remove Donald Callender as General Partner in his official capacity as President of CMA, because the signature block for "Donald J. Callender . . . President of Convergence Management Associates, LLC" was crossed out with the notation "Removed" written over it. J.R. 100. Moreover, Diane, Christian, and Wade Callender had the

present "affirmative evidence in order to defeat a properly supported motion for summary judgment . . . even where the evidence is likely to be within the possession of the [moving party]." *Anderson*, 477 U.S. at 257. Upon consideration of the available extrinsic evidence in the record, the Court finds that the 2007 Assignment transferred ownership of CMA's assets to the General Partner of Falkirk at the time of the 2007 Assignment.

### B. The Partnership Vote

Resolution of the question whether the 2007 Assignment transferred CMA's assets to the General Partner of Falkirk does not by itself resolve the question whether Wade Callender's seizure of the items from the CMA Office was inconsistent with the rights of either Plaintiff. This question requires the resolution of another dispute between the parties: whether Donald Callender and CMA were properly removed as General Partner of Falkirk during the November 3, 2016 meeting of Diane, Christian, and Wade Callender.

The evidence establishes that at the time of that meeting, Donald Callender, in his capacity as President of CMA, was the only General Partner of Falkirk. During that meeting, Diane, Christian, and Wade Callender voted to remove Donald Callender as General Partner. Plaintiffs argue that where the minutes do not explicitly state that Donald Callender was removed in his capacity as President of CMA, the vote mistakenly removed Donald Callender in his personal capacity, who was only a limited partner at the time, and was therefore ineffective. Considered as a whole, however, the minutes of the November 3, 2016 meeting are most fairly read to establish that the voting partners were, in fact, seeking to remove Donald Callender as General Partner in his official capacity as President of CMA, because the signature block for "Donald J. Callender . . . President of Convergence Management Associates, LLC" was crossed out with the notation "Removed" written over it. J.R. 100. Moreover, Diane, Christian, and Wade Callender had the

authority to take this action. Under the Partnership Agreement, "[a] General Partner may be removed as General Partner for cause by the affirmative vote of at least 85 percent of the partnership interests." J.R. 277. Christian and Wade Callender each held a 48.516 percent interest, and collectively, Diane, Christian, and Wade Callender possessed a 98.512 percent interest in Falkirk. Moreover, Wade Callender testified that at the time of the vote, Diane, Christian, and Wade Callender had concluded that Donald Callender had "proven to be an untrustworthy custodian of partnership affairs," J.R. 141, and that he had "commit[ed] malfeasance," J.R. 143. The partners provided specific details on the grounds that they deemed sufficient cause for removal in the December 6, 2016 partnership meeting minutes. Plaintiffs do not contest these reasons. The November 3, 2016 vote was therefore successful in removing Donald Callender in his capacity as President of CMA as Falkirk's General Partner.

Although the November 3, 2016 minutes do not identify by name who took over as General Partner and thereby became the assignee of all of CMA's assets and interests, they state that "general partner duties . . . shall be exercised by 2/3 vote of the signatories hereto," referencing Diane, Christian, and Wade Callender. J.R. 99. Where the Partnership Agreement permits multiple General Partners, and this provision is consistent with the Partnership Agreement's term that a majority vote controls when there are three General Partners, the Court finds that Diane, Christian, and Wade Callender each became a General Partner. Even if, as Wade Callender testified, only Diane Callender was made a General Partner, the distinction is not material to the Motion. If Wade Callender was a General Partner on November 5, 2016, he had a right to possess the property of CMA. Yet even if Diane Callender was the only General Partner at that time, Wade Callender still had a right to possess the property of CMA because there is uncontroverted testimony that Diane Callender directed him to take control of such property. Where the defendant

13

had the authority to possess certain property, a claim of conversion for possession of that property must fail. The Court will therefore grant summary judgment to Wade Callender on CMA's claim of conversion.

As for Donald Callender's claim of conversion, the Complaint alleges that both CMA and Donald Callender personally had property taken by Wade Callender. The evidence adduced of specific items belonging to Donald Callender that were taken is remarkably thin. A summary exhibit created by an associate of Donald Callender identifies only one item that was solely owned by him, a checkbook with a claimed value of $65. In his deposition, Donald Callender further identified "divorce discovery records, framed and matted photographs, [and] my personal Day-Timer." J.R. 45. Even accepting this evidence, Donald Callender has failed to produce any further evidence that it was Wade Callender who took these specific items. There were several other individuals involved in the November 5, 2016 entry to the CMA Office. According to Wade Callender, Diane Callender directed the activities on that occasion. Indeed, Donald Callender has filed criminal complaints against Diane Callender and Danielle Callender, Christian Callender's wife, for theft of his personal property. In the absence of any evidence linking Wade Callender to the specific tortious acts alleged, the Court will grant summary judgment to Wade Callender on Donald Callender's claim of conversion. *See Med. Mut. Liability Soc. of Md. v. B. Dixon Evander and Assocs., Inc.*, 660 A.2d 433, 439 (Md. 1995) ("In any tort action, the plaintiff must establish that *the defendant's* tortious conduct was a cause in fact of the injury for which compensation is sought." (emphasis added)).

### III. Trespass

Both Plaintiffs have also raised trespass claims against Wade Callender based on his entry into the office during the November 5, 2016 incident. Trespass consists of "an intentional or

14

negligent intrusion upon or to the possessory interest in property of another." *Litz v. Md. Dep't of Env't*, 131 A.3d 923, 936 (Md. 2016). There is no dispute that Wade Callender intentionally entered CMA's office on November 5, 2016. The crux of the claim therefore depends on whether this was an intrusion on either Donald Callender's or CMA's possessory interest in the office.

As an initial matter, the lease for CMA's office lists CMA, rather than Donald Callender, as the tenant. To the extent that the lease mentions Donald Callender, it is only in his capacity as a representative of CMA. The Court therefore finds that Donald Callender had no personal possessory interest in the office and grants summary judgment to Wade Callender on Donald Callender's claim.

The Court also finds that Wade Callender's entry into the office was not an intrusion on CMA's possessory interest. The 2007 Assignment, which was effective upon its execution, *see supra* Part II, assigned to the General Partners of Falkirk "all of [CMA's] assets, including but not limited to its real, personal, tangible, intangible and mixed property . . . now owned or later acquired by [CMA]." J.R. 313. This assignment thus necessarily included CMA's possessory interest in the CMA Office as a tenant. Because Wade Callender entered the CMA Office either as a General Partner of Falkirk or on the authority of Diane Callender as the General Partner of Falkirk, he could not have intruded on CMA's possessory interest in the office. The Motion will be denied as to the trespass claim.

### IV. Tortious Interference with Business Relations

Plaintiffs also claim that Wade Callender's entry into CMA's office and seizure of CMA property constituted tortious interference with business relations. A claim for tortious interference with business relations requires four elements:

> (1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such

15

> damage and loss, without right or justifiable cause on the part of the defendants
> (which constitutes malice); and (4) actual damage and loss resulting.

*Blondell v. Littlepage*, 991 A.2d 80, 97 (Md. 2010) (citation omitted). The Court of Appeals of Maryland has clarified that the tortious conduct must be "independently wrongful or unlawful," including such examples as "common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution of groundless civil suits or criminal prosecutions in bad faith." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 271 (Md. 1994) (citation omitted).

Here, Wade Callender is entitled to summary judgment because Plaintiffs have not established that his entry into the CMA Office and seizure of various items was "independently wrongful or unlawful." *Id.* The Court has already held that Wade Callender had the legal authority to enter the CMA Office and secure CMA's property, and that his actions constituted neither conversion nor trespass. *See supra* parts II-III. Because Plaintiffs' only claim for tortious interference arises from conduct that was neither wrongful nor unlawful, it cannot succeed.

Furthermore, Plaintiffs' proffered evidence of damages is insufficient. While Plaintiffs claim $120,000 in lost revenue as a result of the entry, they failed to introduce any documents establishing CMA's business activity at the time. During his deposition, Donald Callender was unable to provide specific details about the supposed lost business. In fact, the only two specific details he offered suggest that Plaintiffs did not suffer damages: first, Donald Callender testified that in 2014 he had formed another company, Intrepid Executive Group, LLC, ("Intrepid") and at that point began winding down CMA and instead doing business through Intrepid. Second and relatedly, he testified that it was Intrepid, not CMA, that suffered the $120,000 loss in revenue. Where Intrepid is not a plaintiff in this case, the Court finds that Plaintiffs have not provided sufficient evidence that CMA or Donald Callender individually suffered damages to sustain a

claim of tortious interference with business relations. For these reasons, the Court will grant summary judgment to Wade Callender on the tortious interference claim.

V.     **Abuse of Process**

Finally, Plaintiffs have claimed that Wade Callender's action of directing the dismissal of the earlier suit against Erica Callender constituted an abuse of process. In *Callender I*, the Court found that Donald Callender lacked standing to pursue his claim but allowed CMA to pursue its claim. *Callender I*, 2018 WL 3609536, at *9. In order to establish a claim of abuse of process, a plaintiff must prove that (1) "the defendant wilfully used process after it has issued in a manner not contemplated by law," (2) "the defendant acted to satisfy an ulterior motive," and (3) "damages resulted from the defendant's perverted use of process." *One Thousand Fleet Ltd. P'ship v. Guerriero*, 694 A.2d 952, 956 (Md. 1997). The Court of Appeals of Maryland has noted that there must be "[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process." *Palmer Ford, Inc. v. Wood*, 471 A.2d 297, 311 (Md. 1984) (citation omitted). "[T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.* (citation omitted).

Under this definition, CMA's abuse of process claim is fundamentally flawed. Abuse of process claims are classically remedies for the subjects of process when that process has been misused. "The most common instance" of abuse of process "is an attempt to extort money from the person subjected to the process." *Id.* For example, an abuse of process has been found where a creditor uses the threat of criminal proceedings as a means to extract payment of a debt from the defendant. *Id.* (listing cases). Here, by contrast, the plaintiff asserting the abuse of process claim—CMA—is distinct from the party who was subject to the process employed—Erica Callender. By

17

voluntarily dismissing a case rather than initiating or threatening to initiate one, Wade Callender was not using legal process, much less abusing it.

Moreover, neither the action nor the actor taking it lacked legal authority. First, voluntary dismissal is an authorized step in litigation. *See* Fed. R. Civ. P. 41(a). Second, legal claims are property interests. *See Berrett v. Standard Fire Ins. Co.*, 888 A.2d 1189, 1200 (Md. Ct. Spec. App. 2005) (holding that a "chose in action is a form of property, in that it is an interest in personal property"); *Chose*, Black's Law Dictionary (11th ed. 2019) (defining "chose in action" to include "a claim for damages in tort"). Accordingly, the combination of the 2007 Assignment and the November 3, 2016 partnership vote transferred CMA's interest in the lawsuit against Erica Callender to the Falkirk General Partners and authorized Wade Callender to dispose of the lawsuit as he saw fit. As a result, Wade Callender's action was not "[s]ome definite act or threat not authorized by the process." *Palmer Ford, Inc.*, 471 A.3d at 311. Regardless of whether Wade Callender acted with "bad intentions," he did "nothing more than carry out the process to its authorized conclusion." *Id.* Plaintiffs have identified no authority supporting an abuse of process claim under such facts, and the Court will not extend this tort to such an unorthodox claim.

Finally, CMA appears to attempt to add a new abuse of process claim, arguing that Wade Callender's actions surrounding the November 3, 2016 divorce hearing by which he arranged to take control of Falkirk constituted an abuse of process. This it may not do. *See Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F. Supp. 2d 399, 435 (D. Md. 2006) ("A plaintiff may not amend its complaint through arguments at the summary judgment stage."). The Court will therefore grant summary judgment to Wade Callender on CMA's abuse of process claim.

## CONCLUSION

For the foregoing reasons, Wade Callender's Motion for Summary Judgment will be GRANTED. A separate Order shall issue.

Date: March 6, 2020

/s/ Theodore D. Chuang
THEODORE D. CHUANG
United States District Judge